KAREN LéCRAFT HENDERSON, Circuit Judge,
dissenting:
Because I believe the prosecutor did nothing impermissible, I dissent from the majority opinion reversing James Earle’s conviction. To clarify my reasons, I will expand on the majority’s bare-bones factual recitation.
Three days after his arrest, Earle made his initial court appearance on December 31, 2001, represented by the Federal Public Defender’s Office. On June 11, 2002 the district court scheduled the trial for July 12, 2002. On the eve of the trial date new developments caught the court, the prosecutor and Earle’s own public defender by surprise. On July 10, two days before the trial was to begin, lawyer Harry Tun filed a motion for continuance, stating he had been retained by Earle’s family just that day and needed a continuance to interview five or six newly-discovered witnesses. At a hearing the following day, Tun informed the court that Earle’s family had contacted Tun immediately after Earle’s arrest but at the time had been unable to' pay his fee, having just finished paying him for successfully representing Earle’s brother, Domingo Stephenson, in a criminal trial “involving [a] similar situation.” 7/11 Tr. at 3. But on the previous day, he explained, “they were able to come up with [a] partial amount of [the] attorney’s fee” and “signed a promissory note to pay the rest of it.” Id. at 4. Tun told the court it was his “understanding” there were “five to six witnesses that need to be interviewed and who will be able to testify on behalf of Mr. Earle during his trial and exculpate his involvement in this case.” 7/11 Tr. at 3. Earle’s public defender informed the court he “didn’t have any knowledge” of the witnesses of whom Tun spoke. Id. at 4. To accommodate Tun, the court rescheduled the trial for September 3, 2002, although the “11th hour”’ change would “wreak[ ] havoc on the schedules of many people,” id. at 10, including the prosecutor who was not available to try the ease on September 3 and would therefore need to find a replacement.
The trial began on September 3 as scheduled, with a substitute prosecutor. During the government’s case, Officers Adcock, Batton and Crisostomo testified that, while pursuing Earle the night of the arrest, they observed him withdraw a firearm from his waistband and throw it into a nearby yard and, after arriving at the “Kwik Mart” where he was arrested, deposit in a trash can a plastic baggie that turned out to contain 11 smaller baggies of cocaine base. When they arrested him, the officers found a bag of marijuana and $329 in cash on his person.
The defense offered the testimony of four witnesses who said they saw a man other than Earle running from the police the night of the incident: George Lewis, Derrick Vaughn, Pedram Roshan and Earle’s girlfriend, Anna Baylor.
George Lewis testified he had known Earle for ten years but did not know his family. On cross examination he stated *1167 Tun’s investigator served him with a subpoena about one month before trial and spoke with him at that time but took no notes. According to Lewis, before that time he had not “spoken to Mr. Tun or anybody associated with Mr. Tun about th[e] case.” 9/5 Tr. at 109. He testified that, a couple of days after talking with Tun’s investigator, he met with Tun, who was writing in a notebook “[m]ost of the time” during the interview. Id. at 110. Lewis also admitted on cross that, contrary to his direct testimony that he did not know Earle’s family, he did know Earle’s brother, Domingo Stephenson, on whose behalf he had testified at the criminal trial that Tun mentioned at the July 11 hearing and that at that trial he had, in similar fashion, falsely testified that he did not know Stephenson’s family.
Derrick Vaughn testified he knew Earle because they played basketball together. On cross-examination, Vaughn testified he met with Tun’s investigator in January 2002. He stated initially that she “was writing things down” during the interview, then clarified that she “didn’t write everything [he] told her” — specifically, that she “didn’t write down what [he] said, what [he] told her” — and finally that he was “not sure” whether she wrote down anything. 9/5 Tr. at 175-76. Vaughn stated he met with Tun a few weeks before trial but could not recall whether Tun took any notes during the interviews. Id. at 175.
Pedram Roshan testified that he also knew Earle from playing basketball. On cross-examination he stated he had met with Tun’s investigator around the third week of January 2002 and that she was writing things down while he was “telling her [his] story.” 9/5 Tr. at 201.
Anna Baylor testified that she was interviewed by Tun’s investigator a few weeks after Earle’s arrest and by Tun twice, once while “[i]t was still cold outside,” 9/5 Tr. at 244. She could not recall whether either Tun or the investigator took notes.
At the end of the court session on September 5, the district court, at the government’s urging, asked Tun to check his files to see if he had any notes, taken either by himself or his investigator, of interviews with the witnesses. The following morning Tun reported that he had none. The government then requested that the court instruct the jury there were no such notes.
At the close of the defense case, the government requested that the court take judicial notice of Tun’s representation, contained in the continuance motion, that the “[defendant and his family retained undersigned counsel to represent defendant on July 10, 2002” and that the court so instruct the jury. Tun opposed the motion, although he did not, indeed could not, dispute the accuracy of the requested instruction. When the court informed counsel it would advise the jury that there were “no contemporaneous notes” of interviews by Tun or his investigator, Tun agreed to the instruction. As the majority notes, the court delivered both instructions to the jury.
I agree with the majority that the court did not err in taking judicial notice of the date Tun was retained as defense counsel or in advising the jury that there were no notes of defense interviews with the witnesses. As the majority notes, the challenged jury instructions were neither confusing nor misleading and the facts they relayed were relevant because they undercut the defense witnesses’ credibility. I cannot agree, however, that it was in any way improper for the prosecutor to suggest to the jurors the following unremarkable inferences from the instructions: that it was unlikely Tun paid his investigator to interview the witnesses in January 2002, some 6 months before Tun agreed to represent Earle on July 10 when Earle’s fami *1168 ly came up with a down payment, that the notes Roshan (and initially Vaughn) testified were taken did not exist and that just maybe, then, the witnesses were lying about the interviews. The prosecutor’s argument was wholly proper and there is no ground to reverse. The majority’s “rationale” for its contrary disposition is bewildering.
The majority finds the government’s suggestion in closing argument that Tun’s investigator did not interview the witnesses in early January 2002 is impermissible because it is inconsistent with the evidence or at least with Tun’s assertions to the court. The inconsistency, however, lies with the defense. Contrary to the majority’s view, the testimony of the three defense witnesses (and Tun’s own claims during trial) that Tun’s investigator interviewed them in January 2002 flatly contradicts Tun’s blanket, unqualified statement contained in the July 10, 2002 continuance motion that the same witnesses “have yet to be subpoenaed or interviewed” and his separate assertion, made in the same motion, that “counsel will not be prepared to try this matter on July 12, 2002 due to his inability to interview, investigate and subpoena appropriate witnesses for defendant” (emphasis added). The unambiguous meaning of the quoted language is that, as of the motion’s date, the newly-emerged defense witnesses had not been interviewed by either Tun or his investigator.
To bolster its position, the majority points, curiously, to Tun’s practice of not taking notes when interviewing clients, which I can only suppose is intended to explain the discrepancy between the defense testimony that the investigator took notes when she interviewed them and the fact the notes do not exist. How Tun’s personal notetaking practices are relevant to the issue eludes me. Equally inexplicable is the majority’s reliance on Tun’s declarations about his own visits with Earle to support the view that Tun must therefore have paid the investigator to interview the witnesses.
I also 'disagree that the prosecutor’s statement necessarily prejudiced Earle— although, given that the government’s argument was permissible, the issue need not be reached. See United States v. Edelin, 996 F.2d 1238, 1243 (D.C.Cir.1993) (in determining whether to reverse convictions on account of misstatement in closing argument, “the court has required a finding both that the prosecutor’s actions were improper and that they substantially prejudiced the jury.” (citing United States v. North, 910 F.2d 843, 897 (D.C.Cir.1990))). The unimpeached testimony of the police officers consistently and unequivocally identified Earle as the fleeing man who discarded the firearm and the bags of cocaine and from whom, at the time of his arrest, the police recovered a bag of marijuana and a large sum of cash. By contrast, the defense testimony was at times tentative, grudging, inconsistent or plainly false. For example, on cross-examination Lewis acknowledged that he testified incorrectly on direct that he was unfamiliar with Earle’s family and admitted he had similarly mistestified at Earle’s brother’s trial; as noted above, Vaughn equivocated over whether the investigator had taken notes during his interview; when asked if he had been convicted in Maryland of possessing marijuana and cocaine, Roshan responded “I don’t believe I was really convicted. I served community 'service,” 9/11 Tr. at 195-96; and Baylor testified erratically or evasively about when she was first interviewed by Tun, whether the shopping mall she said she and Earle had visited the night of the arrest had only recently opened at the time, what route she took from the mall to the Kwik Mart and even whether Earle was her “boyfriend” — in fact she testified she did not even know *1169 where Earle lived. And it is not surprising that the jury sent a note asking how the investigator located the witnesses, maj. op. at 1165, given that Roshan had testified that Earle did not know Roshan’s last name yet the investigator had no problem locating and identifying Roshan on a public basketball court. Further, if the jurors during deliberations “harbored doubts about the identity of the fleeing suspect,” as the majority infers from their question about fingerprints, maj. op. at 1165, the doubts were not resolved as a result of the allegedly improper argument, which had already occurred — although resolved they were by the next morning’s verdict. As for Baylor’s presence at the Kwik Mart, her proximity to her “boyfriend” was unremarkable and — along with the presence of her car' — could well account for Earle’s decision to flee there. Finally, the majority suggests that the prosecutor made “central” the “collateral” issue of Tun’s performance as a lawyer in this case. But it was Tun who personalized the issue. He spoke at length in his closing (filling several pages of the transcript) about what a lawyer “who cares about his client” would do under the circumstances, 9/16 Tr. at 97, and what he and his investigator in fact did before trial.
In sum, the prosecutor’s argument was simple, straightforward and entirely logical. He asked the jurors to consider whether the defense witnesses’ testimony was credible, that is, was it likely, as the witnesses testified, that defense counsel would have sent his paid investigator to interview witnesses 6 months before he agreed to represent Earle and that during the interviews the investigator would have taken notes that did not exist. The jurors apparently reached the same conclusion as the prosecutor.